UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MORTGAGE LENDER SERVICES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>2408 I STREET and 2407 J STREET, SACRAMENTO, CA  95816, et al.,<br><br>Defendants. | No.  2:19-cv-02568-TLN-KJN<br><br><br><br>**ORDER** |

This matter is before the Court on Claimant John Orradre's ("Orradre") Motion for Summary Judgement (ECF No. 20) and Claimant Roger P. Duke's ("Duke") Cross-Motion for Summary Judgment (ECF No. 22).  As set forth below, Orradre's Motion (ECF No. 20) is DENIED and the cross-motion filed in response by Duke (ECF No. 22)[1] is GRANTED.

///

///

///

---

[1] The Court recognizes that technically Duke has filed both a cross-motion by O Street Partners, LLC in his capacity as Manager (*see* ECF No. 22) and a joinder to that motion in his own name (ECF No. 22-9), but since there is no real distinction between the two alternatives and because Orradre does not argue otherwise, for purposes of this Memorandum and Order, ECF No. 22 will be controlling.

**I.     BACKGROUND**

This interpleader action was instituted in state court by Plaintiff Mortgage Lender Services, Inc., ("Plaintiff") the trustee who sold certain property located at 2408 I Street and 2407 J Street in Sacramento, California ("the subject property'). The subject property was owned by O Street Partners, LLC ("OSP") and then sold at a non-judicial foreclosure sale on June 18, 2019. (ECF No. 1 ¶ 1.) Because the sale resulted in surplus proceeds (in the total amount of $1,403,648.33) as to which several individuals and/or entities claim to be entitled, Plaintiff filed its lawsuit in Sacramento County Superior Court on November 18, 2019, asking the court to determine how the disputed proceeds should be disbursed under California Civil Code § 2924j. (ECF No. 1-1 at 2.) Orradre and Duke — both of whom had ownership interests in OSP — filed formal claims for the entire surplus proceeds on grounds that each was in fact the sole duly designated "manager" of OSP and accordingly entrusted with handling its affairs under OSP's Operating Agreement. (ECF No. 1-2 at 10–20, 61–132.) On December 13, 2019, after Plaintiff deposited the surplus funds with the state court, Plaintiff was discharged as a party and an additional hearing was scheduled for February 28, 2020, to address competing claims to the funds. In the meantime, however, the United States, who also asserted a claim to a portion of the proceeds based on Duke's unpaid individual tax liabilities, removed the case to this Court on the grounds that the lawsuit implicated its interests under 28 U.S.C. § 2410.

OSP was formed as a limited liability company ("LLC") on July 28, 2011. The company's majority interest (65 percent) was owned by Orradre and Mary F. Orradre, as Trustees of the 1988 Orradre Revocable Trust UDT dated April 26, 1988 ("the Trust"). Minority shareholders included the Orradres' son and daughter-in-law, John and Laura Orradre (10 percent) and Paula Downing and Duke (each 12.5 percent). In addition to his ownership interest, Duke was also designated as OSP's "single Manager" under the terms of the company's July 28, 2011 Operating Agreement. (*See* Agreement, Ex. 1 to the Decl. of Roger Borzini, ECF No. 20-3, ¶ 6.1.1.)

As Manager, the Agreement gave Duke broad latitude in operating the LLC subject only to certain limitations not applicable here, stating in pertinent part as follows:

2

> "[T]he Manager shall have full, exclusive, and complete discretion, power and authority to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions and to take all actions affecting such business and affairs for and on behalf of the Company…."

(*Id.* at ¶ 6.1.2.)

The Agreement went on to delineate specifically enumerated powers, which included "[]compromising, arbitrating, and otherwise adjusting or settling claims of any kind . . . in favor of or against the Company and/or relating to the Company or any Company asset. . . ." (*Id.* at ¶ 6.1.2(k).) In addition, and significantly for purposes of the present matter, the Agreement authorized removal of the Manager only in two instances: (1) following a bankruptcy petition filed on his or her behalf; or (2) if a court or arbitrator has entered a decree that "the Manager has committed fraud and/or gross negligence in exercising or failing to exercise the Manager's duties as a Manager of the Company." (*Id.* at ¶ 6.1.6.) Moreover, even if one of those two contingencies are satisfied, 75 percent of the percentage ownerships interests in OSP were required to effectuate the Manager's removal. (*Id.*)

In September 2012, OSP executed a promissory note secured by a Deed of Trust to purchase the subject property, which consisted of an office building and adjacent parking lot at 2401 J Street and 2408 I Street in Sacramento, California. The Trust loaned OSP $4.2 million to purchase the property and was consequently the beneficiary under the Deed of Trust. (Decl. of Duke, ECF No. 22-1, ¶¶ 5–6.)

Following what appears to have been a dispute over control over OSP, the Trust and other OSP members filed a lawsuit in August of 2018 against Duke in state court for declaratory relief, injunctive relief, and breach of fiduciary duty. After unsuccessfully moving for a temporary restraining order, the plaintiffs sought a preliminary injunction which sought to remove Duke from his position as OSP's Manager. The state court denied that motion on October 5, 2018,[2] finding that in the absence of either bankruptcy or a finding of gross negligence or fraud, removal

---

[2] Duke, as OSP's Manager, has requested that the Court take judicial notice both of this Minute Order and the Trust's June 18, 2019 answer to Duke's lawsuit against the Trust on behalf of OSP. As court records, those documents may be so noticed under Federal Rule of Evidence 201(b)(2) and Duke's request (ECF No. 25-5) is accordingly GRANTED.

was not permitted under ¶ 6.1.6 of the Operating Agreement. The state court opined that Duke continued to be OSP's Manager until such a showing had been made. (Duke Decl., ECF 22-1, Ex. 1.)[3]

Although the state court lawsuit against Duke remains ongoing, Duke believes that the Trust attempted to usurp his management control by foreclosing on the Deed of Trust, which secured OSP's purchase of the subject property. It did this, according to Duke, by allegedly depriving OSP of funds that rendered it unable to make payments on the loan. (*See* Duke Decl., ¶¶ 10, 11.) The Trust's Notice of Default and Election to Sell under Deed of Trust was recorded on December 12, 2018. (Ex. 1 to Duke Decl, ECF No. 25-2.)

On March 25, 2019, Duke, as OSP's Manager, filed his own complaint on OSP's behalf in state court against the Trust, asserting claims for breach of contract, breach of fiduciary duty, and intentional interference with contractual relations. (Duke Decl., ¶ 16.) At about the same time, the parties agreed to an undated Memorandum of Understanding ("MOU"). (Ex. 1 to Decl. of John Poulos, ECF 24-1.) The MOU addressed the ownership and management structure of OSP and that of two other companies in which the parties shared interests, JRS Rocklin Partners, LLC and The James Rocklin, LLC. With respect to OSP, the parties agreed that in exchange for Duke's immediate resignation as Manager, the Trust would pay Duke $110,000.00 for his 12.5 percent interest in OSP, and OSP would both convey the parking lot portion of the subject property (at 2408 I Street) free and clear of all encumbrances (except existing tenant parking rights) and pay Duke for attorney's fees expended in an amount not to exceed $40,000.00.

While the terms of the MOU are described as being "binding and may be enforced by specific enforcement," Duke's counsel described the agreement as still "preliminary" with "the obligations within the MOU of each party . . . dependent on the other party performing their end of the bargain." (Decl. of Ravi Mehta, ECF No. 25-3, ¶ 9.) He therefore discounted any notion that Duke had actually resigned at the time the MOU was signed as the Trust and OSP's majority shareholders later claimed. (*Id.*) That understanding is underscored by the fact that the parties

---

[3] The Court also recognizes that Orradre has filed objections to various portions of the Duke Declaration and its exhibits. Those objections are OVERRULED.

4

1  subsequently began to prepare a formal Settlement Agreement and Mutual Release based on the
2  MOU.  On May 14, 2019, counsel for Duke received an email from John Poulos (representing the
3  Trust and OSP's majority interests) attaching a draft Agreement which called for an "Effective
4  Date" corresponding both with Duke's resignation and payment by the Trust for his membership
5  interests.  That draft agreement already deviated from the terms of the MOU as originally
6  negotiated by calling for a payment to Duke of $240,000.00 for his 12.5 percent ownership
7  interest, subject to a $130,000.00 option for Duke to purchase the 2408 I Street property, rather
8  than a $110,000.00 payment to Duke as set forth in the MOU together with a free and clear
9  conveyance to him of the I Street parcel.  (*See* Draft Agreement, Ex. 1 to Mehta Decl., ECF No.
10 25-3.)  In addition, according to Duke, up until the time of the foreclosure sale, he continued to
11 collect rents from OSP's property tenants and to handle all other tenant and OSP matters, which
12 again runs counter to any claim that he resigned on or about April 1, 2019, as Orradre now
13 contends.  (Duke Decl., ECF No. 25-1, ¶ 14.)

14        In any event, the settlement was never finalized since the Trust shortly thereafter elected
15 to simply move forward with foreclosure, absent explanation or notice to Duke.  (Duke Decl., ¶
16 12.)  Both parcels owned by OSP (including the parking lot that Duke was supposed to receive
17 pursuant to the MOU) were subsequently sold at a trustee's sale on June 18, 2019.  The Trust
18 itself was the successful bidder at $6,050,000.00, and after Plaintiff (the foreclosing trustee) paid
19 the Trust as foreclosing creditor the sum of $4,642.466.24, along with fees and expenses, that left
20 a net surplus of $1,403,648.33.  (*See* Pl.'s Petition, Ex. 1 to Notice of Removal, ECF 1-1.)

21        Plaintiff, after giving notice to those entities with a recorded interest in the subject
22 property as required by California Civil Code § 2924j(a), received a total of three claims for the
23 surplus proceeds.  (ECF No. 1-1 at 41.)  Duke, as Manager of OSP, submitted a claim for
24 $1,850,000.00, a sum in excess of those monies available.  (*Id.* at 41, 43–89.)  Second, the
25 Internal Revenue Service made a claim for personal back taxes allegedly owed by Duke as an
26 individual in the amount of $330,553.21.  (ECF No. 1-1 at 41, 91–94.)  Finally, John Poulos, as
27 counsel for Michel and Mary Orradre, informally requested that all funds simply be sent to
28 creditors of OSP, and specifically to Exchange Bank and Five Star Bank to pay off credit lines in

the amount of $776,259.21 and $746,406.25, respectively, for a total amount also exceeding the surplus monies available.

Plaintiff professed to be unable to determine to whom the proceeds rightfully belonged because of the dispute as to what representative of OSP had lawful entitlement. As Plaintiff points out in the Petition, this was because "Roger Duke alleges he was improperly removed as manager, [whereas] the Orradres allege that Mr. Duke had resigned . . . . " (ECF No. 1-1 at 41.) Plaintiff therefore decided to interplead the funds by filing a Petition for Distribution Regarding Unresolved Claims with the state court on November 18, 2019, the same day it deposited the surplus proceeds. (ECF No. 1-1 at 3.) Under California Civil Code § 2924j(c), the state court interpleader statute under which the Petition was brought, a Trustee like Plaintiff, following a Trustee's Sale, can deposit any funds remaining after the obligations secured by the Deed of Trust have been satisfied should entitlement to those funds be disputed.

Plaintiff's deposit of the surplus funds with the state court represents the first step in the interpleader process and permitted the state court to discharge Plaintiff of any further responsibility for disbursement of the sale proceeds, which it did by Order dated December 13, 2019. (ECF No. 1-2 at 133.) To initiate the second stage, the state court set a deadline of January 30, 2020 for any potential claimant to submit a claim against the proceeds prior to a hearing to be held on February 28, 2020, as to disposition of the proceeds. (*Id.*) Both Orradre and Duke made formal claims, each ostensibly in the role of Manager for OSP.

Because the United States removed the matter to federal court on December 19, 2019, less than a week after issuance of the state court order discharging Plaintiff from liability in the first stage of the interpleader process, there was no disposition in state court as to entitlement to the proceeds (the second stage) prior to removal here. Both Orradre and Duke now attempt to do that by way of the instant cross-motions for summary judgment.

II.   **STANDARD OF LAW**

A.   Summary Judgment

The Federal Rules of Civil Procedure ("Rules" or "Rule") provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is

6

1  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*,
2  477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually
3  unsupported claims or defenses. *Celotex*, 477 U.S. at 325.

4  In a summary judgment motion, the moving party always bears the initial responsibility of
5  informing the court of the basis for the motion and identifying the portions in the record "which it
6  believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.
7  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to
8  establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus.*
9  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *First Nat'l Bank v. Cities Serv. Co.*, 391
10 U.S. 253, 288–89 (1968).

11 In attempting to establish the existence or non-existence of a genuine factual dispute, the
12 party must support its assertion by "citing to particular parts of materials in the record, including
13 depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other
14 materials; or showing that the materials cited do not establish the absence or presence of a
15 genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."
16 Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is
17 material, i.e., a fact that might affect the outcome of the suit under the governing law. *Anderson*
18 *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52 (1986); *Owens v. Local No. 169, Assoc. of W.*
19 *Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also
20 demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that
21 a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In
22 other words, the judge needs to answer the preliminary question before the evidence is left to the
23 jury of "not whether there is literally no evidence, but whether there is any upon which a jury
24 could properly proceed to find a verdict for the party producing it, upon whom the onus of proof
25 is imposed." *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. 442, 448
26 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has
27 carried its burden under Rule [56(a)], its opponent must do more than simply show that there is
28 some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Therefore,

7

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

B.  Interpleader

A stakeholder holding funds or property to which conflicting claims may be made, like Plaintiff herein, is entitled to protect itself from multiple liability by requiring potential claimants to litigate between themselves who is entitled to the funds or property. In federal court, that is accomplished by commencing an action in interpleader. *See, e.g.*, *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1265 (9th Cir. 1992). An interpleader action entails a two-stage process. First, the court determines the propriety of interpleading the adverse claimants and relieving the stakeholder from liability. As indicated above, that determination has already been made, inasmuch as both the state court, and the District Court, upon removal, discharged Plaintiff from such liability upon deposit of the disputed funds. (*See* ECF No. 2-1 at 134, ¶ 4 (state court); ECF No. 17 (the Court's April 21, 2020 Order discharging Plaintiff after transfer of deposited proceeds from state court).) The second stage involves an adjudication of the adverse claims of the defendant claimants.'" *Metro. Life Ins. Co. v. Billini*, 2007 WL 4209405 at *2 (E.D. Cal. 2007) (quoting *First Interstate Bank of Or. v. U.S.*, 891 F. Supp. 543, 546 (D. Or. 1995)).

**III.   ANALYSIS**

There is no dispute that because the subject real property was OSP's primary asset,[4] the

---

[4] While the 2011 Operating Agreement itself lists OSP's purpose as to own, operate, and manage real property on 0 Street and on 20th Streets in California, as indicated above, OSP subsequently purchased the subject property in 2012 and presumably divested itself of the originally held properties at O and 20th Streets, since there is no dispute that at the time of the 2019 foreclosure sale the subject property was the company's primary asset. (*See* Orradre Undisputed Fact No. 3.)

sale of that asset calls for dissolution of OSP under its Operating Agreement.[5]  There is also no question that OSP's Manager is entrusted under the Operating Agreement with the specific responsibility of winding up the company's affairs in the event of dissolution.  The Agreement states:

> The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Manager, who is hereby authorized to take all assets to accomplish such distribution.

(Operating Agreement, Ex. 1 to the Borzini Decl., ¶ 16.3.)[6]

Particularly when combined with the already broad powers, as enumerated above, of "full, exclusive and complete discretion, power and authority to manage, control, administer and operate the Company. . . . and to make all decisions and take all action affecting [its] business and affairs" (*id.* at ¶ 6.1.2), there can be no doubt that whoever is OSP's manager, that person is the individual authorized by the company's Operating Agreement to properly claim, and ultimately disburse, the surplus proceeds deposited with this Court.

Here there are two competing candidates — Duke and Orradre — who, as indicated above, both filed formal claims for the surplus funds once they were interpleaded by Plaintiff.[7]  Both profess to be OSP's duly authorized Manager, and accordingly entitled to the interpleaded funds on that basis.  However, as evidenced in the Operating Agreement, only *one* such Manager

---

[5]    Section 16.1 of the Agreement provides that OSP "shall be dissolved, its assets disposed of, and its affairs wound up on. . . (iv) The sale of all or substantially all of the Property."

[6]    Orradre admits in response to Duke's Additional Statement of Material Fact No. 5 that "the winding up of the Company's affairs and distribution of its assets shall be conducted exclusively by the Manager." (ECF No. 24-3 at 3, ¶ 5.)

[7]    Following its unsuccessful summary judgment motion, and in response to Orradre's Motion for Summary Judgment now before the Court, the United States acknowledges that its tax "lien against Mr. Duke does not extend to funds held by O Street Partners until they are distributed to Mr. Duke" and accordingly takes no position regarding the present dispute involving the management of OSP.  (ECF No. 23.)  The United States is therefore no longer a claimant to the gross surplus proceeds and concedes that it only seeks to recover Duke's individual tax liability should any distribution ultimately be made to Duke for his ownership interest after OSP's affairs have been wound up.

can be installed. (*Id*. at 6.1.1 ("The Company shall be managed by a single Manager. . . .").) It also appears undisputed that OSP's debts exceed the $1,403,648.33 in interpleaded funds.[8] Orradre makes claims on behalf of the Trust alone for amounts it paid to reduce OSP's lines of credit, and unpaid sums on the credit lines for which the Trust remains responsible as guarantor, totaling $1,484,480.59. (ECF No. 1-2 at 21–38.) In addition, according to Roger Borzini, who served as an accountant for both OSP and the Trust, there is another unsecured note with a current balance of $196,114.22 payable to the James Rocklin, LLC, as well as $68,567.68 in security deposits payable to former tenants, unsecured notes with a current balance of $25,000 payable to Orradre, and other current payables totaling $4.487,35. Borzini estimates OSP's total indebtedness at $1,845,827.17. (Borzini Decl., ECF 20-1.) While Duke's post-interpleader claim was simply for the entire surplus proceeds (ECF No. 1-2 at 61), the claim he submitted to the foreclosure trustee before the funds were interpleaded was for $1,850,000, a similar amount also well over the available excess funds. Duke disputes Borzini's figures on grounds that he terminated Borzini as OSP's accountant on June 20, 2019 and subsequently, as OSP's Manager, Duke entered into agreements entailing financial obligations on OSP's part that Borzini knew nothing about. (*See* Duke Decl, ECF No. 22-1, ¶¶ 19–20.)

At any rate, what is clear is that OSP is an insolvent corporation faced — even after sale of its principal asset — with more debts that it can pay with the proceeds from the sale. Under those circumstances, Duke argues that as OSP's Manager he has to pay the debts proportionately to whoever are ultimately determined to be the LLC's remaining creditors. In moving for summary judgment, Orradre, on the other hand, asks this Court, rather than the OSP's rightful Manager, to direct payment to the unsecured creditors as follows:

> The Surplus funds therefore should be ordered payable as follows: $663,218.48 to Exchange Bank, $559,804,69 to Five Star Bank, and the balance of the funds to O Street's creditors on a pro-rata basis.

(ECF No. 20-1, 7:15–18.)

Duke maintains that OSP cannot treat the Exchange and Fire Star Bank loans any more

---

[8] In moving for summary judgment, Orradre concedes that OSP's "liabilities currently exceed its assets." (ECF No. 20-1, 6:2.)

preferentially than unsecured obligations due to other creditors just because the Trust happened to serve as guarantor for those loans.  On a more fundamental level, however, Orrade misapprehends the nature of interpleader practice.  It is not the Court's job to direct payment of funds to particular creditors.  Instead, given the clear and unambiguous language of the Operating Agreement that OSP's Manager must make those decisions, it must simply decide which of the claimants purporting to serve in that capacity — Orradre or Duke — are properly entrusted with that responsibility.  Neither Five Star Bank or Exchange Bank, or any other unsecured creditor of OSP, is even a formal claimant to the funds in these interpleader proceedings.  Instead, both Orradre and Duke claim that entitlement as OSP's alleged Manager.

In his cross-motion for summary judgment, Duke argues he has been OSP's Manager since the inception of the company in 2011 and that he continues to serve in that capacity.  Duke points both to OSP's Operating Agreement and to the fact that he continued to discharge the duties as Manager until the time the subject property was sold in June of 2019.  Duke argues that Orradre, in his own motion, has failed to point to even a "scintilla of evidence" showing otherwise.  (ECF No. 22, 15:9–11.)  Orradre's only affirmative argument in response is that "Duke unequivocally resigned as manager of OSP as of April 1, 2019" pursuant to the MOU between OSP's shareholders entered into around that time.  (ECF No. 24, 8:10–11.)  Under the circumstances as outlined above, that argument is virtually devoid of credulity.

First, while the MOU purported to be binding and enforceable by specific performance, the fact remains that it called for performance on both sides: in exchange for Duke resigning as Manager of OSP, he was to receive $240,000.00 for his 12.5 percent interest in OSP as well as $40,000.00 towards legal fees he incurred.  It is undisputed that those payments were not made; indeed, the Trust proceeded to foreclose on the very asset — the parking lot located at 2408 I Street Duke was supposed to receive as part of the MOU.  Second, the Trust proceeded with foreclosure after Orradre's own attorney prepared a Draft Settlement Agreement, based on the MOU, which clearly indicated that any contemplated resignation by Duke was linked to the effective date of the ultimate Settlement Agreement and not the MOU.  (*See* ECF No. 25-3, Ex. 1.)  Therefore, neither party performed on the MOU and Duke's contingent obligation to resign is

unenforceable.  Third, the Trust admitted in its June 18, 2019 answer to Duke's lawsuit, which was filed well after Duke's alleged April 1, 2019 resignation, that Duke remained OSP's manager.  (*See* Ex. 2 to Duke Decl., ECF No. 22-1, ¶ 3.)  Fourth and finally, Duke continued to act as OSP's Manager until the property was sold at foreclosure on June 18, 2019, and well after he supposedly resigned several months beforehand.

Having determined: (1) both claimants to the funds interpleaded by this action do so by virtue of their purported capacity as OSP's Manager; (2) under the terms of OSP's Operating Agreement its Manager is specifically entrusted with winding up the company's affairs, including the payment of any remaining unsecured claims with the surplus funds; and (3) Duke was designated Manager at OSP's inception and did not — as Orradre claims — resign as Manager on April 19, 2019, the Court finds that Duke has established as a matter of law by a preponderance of the evidence his entitlement to the interpleaded funds as OSP's rightful manager.  He is entitled to summary judgment on that basis.

### IV.  CONCLUSION

Based on the foregoing, John Orradre's Motion for Summary Judgment (ECF No. 20) is DENIED.  Roger Duke's Cross-Motion for Summary Judgment, as Manager of OSP (ECF No. 22), as joined by Roger Duke in his own name (ECF No. 29) is GRANTED.  The Clerk of Court is directed to distribute all funds deposited in this matter to Roger Duke, in his capacity as Manager for O Street Partners, LLC.

IT IS SO ORDERED.

**DATE: December 8, 2021**

_____
Troy L. Nunley
United States District Judge